UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF TENNESSEE
NASHVILLE DIVISION

| | | |
|---|---|---|
| LUANNE JAMES, an individual,<br><br>Plaintiff,<br><br>v.<br><br>RUTHERFORD COUNTY LIBRARY SYSTEM;<br>THE BOARD OF DIRECTORS OF RUTHERFORD COUNTY LIBRARY SYSTEM;<br>CODY RYAN YORK, in his individual capacity;<br>BETH DUFFIELD, in her individual capacity;<br>JEFFREY WIENCEK, in his individual capacity;<br>SAM HUDDLESTON, in his individual capacity;<br>SUSAN QUESENBERRY, in her individual capacity;<br>DARRELL THOMAS, in his individual capacity;<br>DINA PIAZZA, in her individual capacity; and,<br>JOHN CURTIS, in his individual capacity.<br><br>Defendants. | )<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>) | CIVIL ACTION NO. ______ |

**COMPLAINT**

**INTRODUCTION**

The First Amendment of the United States Constitution protects public libraries against censorship, ensuring a true democracy where the free flow of ideas flourishes unhindered by government oppression. Thus, according to the Supreme Court of the United States, when government officials who manage our public libraries restrict library materials based on personal, subjective preferences for content or viewpoints, they indelibly violate our constitutional rights. Likewise, when

such government officials render decisions based on prejudice and animus towards protected classes, exploiting the authority of our public institutions to reify such prejudices, they transgress the Fourteenth Amendment and other federal anti-discrimination laws. Discrimination expressed and perpetuated by our public institutions is equally repugnant to the American character.

Plaintiff Luanne James is a dedicated librarian who served as Executive Director of the Rutherford County Library System (RCLS) in Tennessee. On March 30, 2026, the Board of Directors of Rutherford County Library System (RCLS Board) unlawfully terminated Ms. James from her position as RCLS Executive Director. As with other recently similar cases across the country, the decision to terminate Ms. James immediately followed her opposition to and refusal to censor children's books with gay and transgender characters and content. In so doing, Defendants violated not only Ms. James' constitutional and statutorily-protected rights but trammeled on the community's constitutional rights as well. Such violations must be vindicated by this Court.

**PARTIES AND JURISDICTION**

1. This action is authorized and instituted under the Constitution and laws of the United States pursuant to Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e et seq. and 42 U.S.C. §§ 1981(a), 1983, and 1985. Subject-matter jurisdiction is conferred on this Court pursuant to 28 U.S.C. §§ 1331 and 1343. Jurisdiction supporting Ms. James' claim for attorney fees and costs is conferred by 42 U.S.C. § 1988.

2. Venue is proper in the Middle District of Tennessee pursuant to 28 U.S.C. § 1391(b). All Defendants resided within and/or performed official duties within the Middle District of Tennessee's Nashville Division.

3. Plaintiff Luanne James has been a resident of Tennessee since July 2025. She is a citizen of the United States and currently resides in Murfreesboro, Tennessee.

4. Defendant Rutherford County Library System (RCLS) is a governmental non-profit agency 509(a)(3), Type I.

5. Defendant RCLS has an annual operating budget of $4.2 million and is funded by Rutherford County, the Cities of Eagleville and Murfreesboro, and the Town of Smyrna.

6. Defendant RCLS serves the Greater Rutherford County community from six branches and a bookmobile.

7. Defendant RCLS employs approximately seventy employees.

8. Defendant RCLS is governed by The Board of Directors of Rutherford County Library System.

9. Defendant The Board of Directors of Rutherford County Library System (RCLS Board) consists of eleven members, four of whom are appointed by the City Council of Murfreesboro, four of whom are appointed by the Rutherford County Commission, two of whom are appointed by the Smyrna Town Council, and one of whom is appointed by the Eagleville City Council.

10. Defendant Cody Ryan York served as a Rutherford County representative on the RCLS Board from January 12, 2023, through June 30, 2026.

Defendant York was chair of the RCLS Board from July 1, 2025, through June 30, 2026. At all times relevant to this action, Defendant York resided in Tennessee and performed official duties within the Middle District of Tennessee's Nashville Division.

11. Defendant Beth Duffield has served as a Rutherford County representative on the RCLS Board since July 1, 2025. At all times relevant to this action, Defendant Duffield resided in Tennessee and performed official duties within the Middle District of Tennessee's Nashville Division.

12. Defendant Jeffrey Wiencek has served as a Rutherford County representative on the RCLS Board since August 14, 2025. At all times relevant to this action, Defendant Wiencek resided in Tennessee and performed official duties within the Middle District of Tennessee's Nashville Division.

13. Defendant Sam Huddleston has served as a City of Murfreesboro representative on the RCLS Board since March 17, 2025. Defendant Huddleston was vice-chair of the RCLS Board from July 1, 2025, through June 30, 2026. At all times relevant to this action, Defendant Huddleston resided in Tennessee and performed official duties within the Middle District of Tennessee's Nashville Division.

14. Defendant Susan Quesenberry has served as a City of Murfreesboro representative on the RCLS Board since September 19, 2024. Defendant Quesenberry was secretary of the RCLS Board from July 1, 2025, through June 30, 2026. At all times relevant to this action, Defendant Quesenberry resided in Tennessee and performed official duties within the Middle District of Tennessee's Nashville Division.

15. Defendant Darrell Thomas has served as a City of Murfreesboro representative on the RCLS Board since July 1, 2025. At all times relevant to this

action, Defendant Thomas resided in Tennessee and performed official duties within the Middle District of Tennessee's Nashville Division.

16. Defendant Dina Piazza has served as a City of Murfreesboro representative on the RCLS Board since July 20, 2023. At all times relevant to this action, Defendant Piazza resided in Tennessee and performed official duties within the Middle District of Tennessee's Nashville Division.

17. Defendant John Curtis has served as a City of Eagleville representative on the RCLS Board since September 23, 2025. At all times relevant to this action, Defendant Curtis resided in Tennessee and performed official duties within the Middle District of Tennessee's Nashville Division.

**ADMINISTRATIVE EXHAUSTION**

18. Ms. James filed a Charge of Discrimination with the Equal Employment Opportunity Commission (EEOC).

19. The Charge of Discrimination was timely filed within 300 days of the discriminatory and retaliatory acts complained of therein.

20. Ms. James received a Notice of Right to Sue enabling her to bring her Title VII claims to federal court on Friday, June 26, 2026.

21. Ms. James has filed this lawsuit within 90 days of receipt of her Notice of Right to Sue.

22. None of Ms. James' other claims require administrative exhaustion.

## FACTUAL ALLEGATIONS

### *Ms. James' Dedication to Public Libraries*

23. Luanne James is a highly educated, credentialed, and certified professional librarian.

24. Ms. James has worked as a professional librarian for the past twenty-six years.

25. Ms. James graduated from the University of North Texas with a Master of Library Science in August 2006.

26. Ms. James then went on to earn her Texas Librarian Certification in October 2006; her North Carolina Librarian Certification in October 2007; and her South Carolina Librarian Certification in January 2012.

27. In November 2024, Ms. James earned her Master of Public Administration degree from Purdue Global University.

28. From 2002 to 2004, Ms. James worked as the Library Director for Port Isabel, Texas' public library system. In that role, she initiated and secured the library's first grant-funded project dedicated to expanding the children's section of the main library branch.

29. From 2004 to 2007, Ms. James served as the Library Director for the public library system in Brownsville, Texas. In addition to overseeing all programs and services, Ms. James spearheaded construction of an additional library branch building.

30. In 2011, the public library system in Chester County, South Carolina recruited and hired Ms. James as its Library Director. Ms. James moved across the country and worked for Chester County in that position for one year.

31. After that, the public library in York County, South Carolina recruited and hired Ms. James. She spent the next twelve years of her career there.

32. From 2012 to 2024, Ms. James served as the Grant and Assessment Coordinator for the York County Library, a role that the Library Director created especially for Ms. James. In this role, Ms. James managed the library's grant program and developed its strategic plan based on her collection, analysis, and reporting on systemwide data.

33. From 2024 through 2025, Ms. James worked remotely as a grant reviewer for the Washington D.C. Office of the State Superintendent of Education.

34. In early 2025, Ms. James learned Defendant RCLS was looking to hire a new Executive Director.[1]

35. Based on her experience and desire to serve as executive director of a growing library system, Ms. James applied for the position.

36. Ms. James did not know at that time that Defendants planned to "empty libraries" of children's books with gay and transgender characters and content using a playbook becoming popular with discrimination and censorship activists across the country.

---

[1] After forty-eight years working for RCLS and twenty years as RCLS Executive Director, Rita Shacklett retired on February 29, 2024. Mindy Barrett then served as RCLS Interim Director for the next seventeen months until Ms. James started as RCLS Executive Director on July 28, 2025.

***Defendants Turn to Increasingly Common Tactics to "Empty Libraries" of Gay and Transgender Content***

37. The American Library Association (ALA) started collecting censorship data in 1990.[2]

38. On or about 2021, a new and unprecedented wave of coordinated censorship began targeting public libraries across the United States.[3]

39. Public libraries commonly maintain formal procedures that allow patrons to challenge library materials, including whether a particular item should remain in the library's collection, be relocated in the collection, or be otherwise restricted.[4]

40. Prior to 2021, across the United States, reconsideration requests were typically made by individual patrons objecting to one unique title, with the national annual average of challenges totaling approximately 273 unique titles between each year from 2001 to 2020.[5]

41. By 2025, the frequency of book challenges across the country spiked. According to ALA data, no longer were individual patrons submitting limited challenges to a unique title; instead, activists had begun circulating entire lists of titles

[2] *Censorship by the Numbers: Banned Books Data*, AMERICAN LIBRARY ASSOCIATION, https://www.ala.org/bbooks/book-ban-data (last visited Sept. 8, 2026).
[3] *Id.*
[4] RCLS, for example, maintains a form entitled a Request for Reconsideration of Library Materials (the "reconsideration request"). An RCLS patron may use this form to initiate the formal review process under the Reconsideration of Materials policy (the "reconsideration process").
[5] *See supra* note 2.

for challenges across the United States, with the annual average nationally climbing to over 3,000 unique titles from 2021 to 2025.[6]

42. From 2001 to 2020, according to ALA data, government officials and censorship activist organizations challenged fewer than 50 titles annually.[7]

43. Like the number of reconsideration requests, according to ALA data, the nature of who lodged book challenges also dramatically evolved. Between 2021 and 2025, government decision-makers and activist organizations influencing those officials challenged well over 5,000 titles annually.[8]

44. One coordinated nationwide tactic to "empty libraries" of children's books with LGBTQ characters or content was CatholicVote's "Hide the Pride" campaign.

45. Groups like CatholicVote coordinate national campaigns to target LGBTQ content and communities.

46. On June 3, 2022, CatholicVote formally launched its "Hide the Pride" campaign, calling on activists to check out and fail to return all the books on Pride Month displays at their local public libraries and to use those books as leverage to accomplish its goal: "Empty Libraries of LGBTQ Content Aimed at Kids."[9]

---

[6] *See supra* note 2.
[7] *See supra* note 2.
[8] *See supra* note 2.
[9] *CatholicVote Launches 'Hide the Pride' to Empty Libraries of LGBTQ Content Aimed at Kids*, CATHOLICVOTE (Jun. 3, 2022) https://catholicvote.org/catholicvote-launches-hide-the-pride-to-empty-libraries-of-lgbtq-content-aimed-at-kids%EF%BF%BC/.

47. CatholicVote is a national 501(c)(4) organization that operates a political action committee (PAC) and has publicly opposed equal rights for the LGBTQ community, including same-sex marriage.

48. CatholicVote has reframed *Obergefell v. Hodges* as a decision to "prioritize adult desires over children's developmental and emotional needs" that causes "tangible harm to children." Just this year, CatholicVote outlined a "coordinated effort seeking to challenge" *Obergefell*: "reframing marriage policy around the parent-child relationship; shaping public opinion by emphasizing the harmful effects of same-sex marriage and broader family breakdown on children; and mobilizing Christian churches to advocate for legal change."[10]

49. That reframing and equating support of the equal protection of LGBTQ persons as causing "harm" to children is the same strategy Defendants used to discriminate against LGBTQ persons in Rutherford County, Tennessee.

50. The express goal of CaholicVote's "Hide the Pride" campaign was to "empty local taxpayer-funded libraries of progressive sex- and gender-related content aimed at children,"[11] because according to CatholicVote, such books "push eroticism, glorify LGBTQ identities, undermine parental rights, and are 100% contrary to the Church's teaching on love and sexuality."[12]

---

[10] *CatholicVote joins 'Greater Than' coalition to challenge Obergefell, prioritize children's rights*, CATHOLICVOTE (Jan. 28, 2026) https://catholicvote.org/catholicvote-joins-greater-than-coalition-to-challenge-obergefell-prioritize-childrens-rights/.
[11] *See supra* note 9.
[12] *CATHOLICVOTE PRESENTS HIDE THE PRIDE*, CATHOLICVOTE, 3 https://catholicvote.org/wp-content/uploads/2022/06/cv-hide-the-pride-printable.pdf (last visited Sept. 18, 2026).

51. CatholicVote created a template letter for homophobic and transphobic censorship activists to send to library officials. Activists were instructed to continuously check out "LGBTQ books targeted at kids" so as to render them inaccessible to other patrons until their libraries capitulated to their demand that the books be removed. The letter stated: "[t]o protect our children and the community, we have checked out the books in the pride display. We plan to keep these books checked out until the library agrees to remove the inappropriate content from the shelves."[13]

52. Likewise, Defendants reframed LGBTQ content as "inappropriate." The LGBTQ content was not inappropriate but acknowledged the existence of gay, non-binary, and/or transgender persons, whose existence Defendants messaged as being "harmful to children."

53. Two weeks after its launch of "Hide the Pride," CatholicVote reported its initial successes of "numerous participants," including photos of empty Pride Month displays at public libraries across the United States, such as the below images from one participant who checked out fifty-two books to hide and shared that she would be "praying for victims of LGBTQ ideology."[14]

---

[13] *See supra* note 9.

[14] *Parents Report: 'Hide the Pride' Halfway through 'Pride Month,'* CATHOLICVOTE (Jun. 15, 2022), https://catholicvote.org/parents-report-hide-the-pride-halfway-through-pride-month/. CatholicVote continued to celebrate similar success in public libraries across the United States in subsequent years. *See Hide the Pride 2023 Roundup*, CATHOLICVOTE (Jun. 29, 2022) https://catholicvote.org/hide-the-pride-2023-roundup/; *see also* CATHOLIC ACCOUNTABILITY PROJECT BY CATHOLICVOTE, https://catholicvote.org/heroes_zeroes/june-2024/ (last visited Sept. 18, 2026).





54. It is within this national milieu that Defendants' unlawful actions against Ms. James took place.

55. This context elucidates how Defendants exploited the rhetoric of parental concern as a cover for their true objective, to impose their limited political, religious, and partisan ideologies upon the broader community, including a hate of gay and transgender individuals, and a desire to create a hostile library environment towards gay and transgender people.

56. Defendants began pushing the same censorship policies as similarly aligned national organizations, adopting more conservative stances, implementing stricter censorship of LGBTQ voices, and imposing their views on what is orthodox on the people of Rutherford County.

57. The message Defendants wanted to send, notwithstanding the existence of gay or transgender RCLS patrons, was that being gay or transgender was harmful to children.

58. Such a stigmatizing message from public officials and a public institution sends the message that the government is officially hostile to that constituency and that the constituency is not welcome to use government services.

***Early Efforts to Censor Gay and Transgender Content***

59. Defendant Cody Ryan York manifested a bias against gay and transgender individuals well before assuming office. His first documented efforts to remove literature with gay or transgender characters or content preceded his appointment to the RCLS Board.

60. On February 4, 2022, prior to his appointment to the RCLS Board, he was employed as Chief Information Officer of Rutherford County (a position he has held since 2019 and continues to hold). Even back then, York submitted a reconsideration request for the book *Making a Baby* by Rachel Greener, stating "material not appropriate for children's section."

61. Defendant York's alleged concerns about appropriateness for children was part of a national trend, discussed above, to use coded language to effectuate discrimination against gay and transgender individuals and censor literature with such characters and themes. Defendant York used this fomenting rhetoric to target books that acknowledged the existence of gay, non-binary, and/or transgender people, starting with an individual reconsideration request for an individual book.

62. *Making a Baby* by Rachel Greener is a children's picture book that includes families with gay and transgender members in answer to the question: "Where did I come from?"

63. In 2022, the reconsideration process consisted of an RCLS patron submitting a reconsideration request. The Collection Development Coordinator reviewed the request and material with staff input, made a recommendation to the Executive Director, the Executive Director reviewed it, and then the Collection Development Coordinator issued a formal determination letter to the patron by regular mail. If the patron disagreed, they could appeal to the RCLS Board.

64. Within the week, on February 10, 2022, the RCLS Collection Development Coordinator at that time, Lauren Gallina, issued a formal determination letter to Defendant York concluding that *Making a Baby* would remain in the children's section.

65. After RCLS refused to remove *Making a Baby* from its collection, Defendant York did not appeal to the RCLS Board.

66. Instead of following the reconsideration process, Defendant York checked out the book on his personal library card and hid the book in his office, in the Rutherford County Government building. In other words, Defendant York functionally removed it from the RCLS collection, which as described above, is an increasingly common tactic utilized by anti-LGBTQ activists across the country—withholding and disappearing books.[15]

[15] Later, in May 2025, as discussed below, Defendant York also checked out at least four other children's books from the RCLS collection using his personal library card and hid them in his office in the Rutherford County Government building. The four books were children's picture books with gay or transgender characters or content: *Yes! No! A First Conversation about Consent* by Megan Madison, *Julian Is a Mermaid* by Jessica Love, *Pride Puppy* by Robin Stevenson, and *The Rainbow Parade* by Emily Neilson.

67. On January 12, 2023, Defendant York was appointed to the RCLS Board as a Rutherford County representative to complete an unexpired term through June 30, 2023, which was followed by a full three-year term beginning July 1, 2023.

68. Within a few months of Defendant York joining the RCLS Board, the Board began systematically imposing restrictions on the public's access to children's books with gay and transgender characters and content within its collection.

***Defendants Implement Age-Restricted Borrowing to Restrict Access to Children's Books with Gay and Transgender Characters and Content***

69. On June 15, 2023, the City of Murfreesboro adopted an unlawful, discriminatory, anti-LGBTQ Community Decency Standards Ordinance, (Murfreesboro City Ordinance No. 23-0-22) to restrict LGBTQ community members' speech and conduct in public spaces.

70. The adoption of the Murfreesboro Decency Ordinance was driven by animus against the LGBTQ+ community and, in particular, drag performers.

71. The Tennessee Equality Project Foundation, Inc. (TEP) had been hosting a BoroPride Festival support and celebrate the LGBTQ+ community on public property since 2016.

72. In 2022, anti-LGBTQ activists began emailing city officials urging them to cancel the BoroPride Festival and falsely claiming that drag performances, which would be and had always been part of the event, necessarily entailed "indecent behavior" that "exploits," "harms" and "contributes to the sexualization" of children and exposes them to "lewd and obscene acts."

73. This is the same coded language to effectuate discrimination against gay and transgender individuals and censor literature with such characters and themes, as discussed above.

74. The coded language was adopted into the Murfreesboro Decency Ordinance, and later used by Defendants, to describe books with gay or transgender characters or content.

75. The Murfreesboro Decency Ordinance provided for civil and criminal penalties for anyone City or law enforcement officials deemed to have engaged in "indecent behavior" or to have distributed "indecent materials" or held "indecent events" throughout the City. Such prohibited behavior was defined to include any "printed materials, broadcasts, shows, parades, or other such displays that suggest, advertise, or display indecent behavior or that is harmful to minors."

76. The Murfreesboro Decency Ordinance incorporated Section 21-71 of the Murfreesboro City Code, which was enacted in 1977 and defined "sexual conduct" to include "homosexuality," into its definition of "indecent behavior."

77. Taken together, any acts that are "homosexual" in nature or any material or event suggesting homosexuality, could be considered indecent and subject to civil and criminal penalties.

78. On October 6, 2023, the American Civil Liberties Union of Tennessee filed a lawsuit challenging the Murfreesboro Decency Ordinance as unconstitutional discrimination against the LGBTQ community, a federal judge in this Court blocked enforcement of the ordinance with an agreed order between the parties on October 23, 2023, and the City of Murfreesboro, recognizing its liability for violating rights of

LGBTQ persons, repealed the ordinance on January 11, 2024, and paid $500,000 for harm its ordinance caused.[16]

79. Meanwhile, the RCLS Board immediately embraced the Murfreesboro Decency Ordinance as a directive to discriminate against gay and transgender community members across Rutherford County, and continued this trajectory long after the ordinance was revoked.

80. Specifically, at the meeting on July 17, 2023, the RCLS Board Chair at the time, Steve Sullivan addressed the Murfreesboro Decency Ordinance, applying it to the entire RCLS collection, and publicly stating the ordinance would alter book purchases, housing, cataloging, and distribution practices.

81. Like the motivation behind the Murfreesboro Decency Ordinance itself, applying the Murfreesboro Decency Ordinance to the entire RCLS collection was motivated by bias and prejudice, and in an effort to make the public institution hostile to gay and transgender persons.

82. According to the meeting minutes, Mr. Sullivan stated that RCLS Board officers met with the City Manager, RCLS managers and supervisors, and the RCLS Collection Development Coordinator to better understand the impact and scope of the Murfreesboro Decency Ordinance.

---

[16] *See Advocates File Lawsuit Challenging Murfreesboro Efforts to Prevent BoroPride*, ACLU TENNESSEE (Oct. 6, 2023), https://www.aclu-tn.org/press-releases/advocates-file-lawsuit-challenging-murfreesboro-efforts-prevent-boropride/; *Tennessee Equality Project Found., Inc. v. City of Murfreesboro, Tenn.*, No. 3:23-cv-01044, ECF No. 28 (M.D. Tenn. Oct. 23, 2023) (agreed order enjoining enforcement of Murfreesboro's "Decency Ordinance"); *Advocates Win Settlement Ending Anti-LGBTQ Ordinance in Murfreesboro*, ACLU TENNESSEE (Feb. 7, 2024), https://www.aclu-tn.org/press-releases/advocates-win-settlement-ending-anti-lgbtq-ordinance-murfreesboro/.

83. According to the meeting minutes, Mr. Sullivan made the following four "[m]ajor points:"

a. "The ordinance is law, and the board is obligated to operate the library system under the law."

b. "The ordinance applies to minors only, and include only books classified as young adult, juvenile, and children."

c. "The ordinance has an accounting element which means that it will impact not only book purchases, but also the housing, cataloging, and distribution of books. Because of the integrated nature of our system, the ordinance affects all branches."

d. "Our current materials reconsideration process remains in effect, although there will likely need to be tweaks to our processes and policies to refer to the new ordinance. We are asking the director to begin reporting on all such requests as they come in."

84. At that meeting on July 17, 2023, according to the meeting minutes, for the first time, a public comments section was included in the agenda because Mr. Sullivan, "opened the floor to anyone who would like to speak."

85. One public commenter, Talitha Cox asked if a RCLS patron with a juvenile card could check out books from the adult section.

86. According to the meeting minutes, "lengthy deliberations" followed, and Defendant York motioned for the RCLS Executive Director, Rita Shacklett, to investigate how to limit the ability of minor card holders to check out adult books.

87. RCLS Board member Shawn Wright originally seconded the motion. But, according to the meeting minutes, "[a]fter another vigorous discussion, Mr. Wright withdrew his second to the motion to study its legality." The meeting adjourned without a vote on Defendant York's motion.

88. On July 20, 2023, Defendant Dina Piazza was appointed to the RCLS Board as a City of Murfreesboro representative.

89. On August 28, 2023, even though no vote took place on Defendant York's motion at the meeting on July 17, 2023, and purportedly to comply with the Murfreesboro Decency Ordinance, the RCLS Board voted to initiate three new age–restricted patron borrowing profiles: juvenile (twelve years old and younger), young adult (thirteen to seventeen years old), and adult (eighteen years old and older).

90. At the time, Defendants York and Piazza were on the RCLS Board and voted in favor of the new age–restricted patron borrowing profiles.

91. The age–restricted patron borrowing profiles prohibited anyone younger than thirteen years old from checking out a book from the young adult section and further prohibited anyone younger than eighteen from checking out a book from the adult section. The only exception came with *written* permission from a parent or legal guardian.

92. The intent of the age–restricted patron borrowing profiles was to extend the Murfreesboro Decency Ordinance to the entire RCLS collection.

93. Citing the Murfreesboro Decency Ordinance for decisions to impose age restrictions on content across the country, the RCLS Board made its intentions clear. Its goal was to effectuate the alienation and erasure of LGBTQ+ people from

public institutions and wider society. Defendants' goal of targeting and suppressing books with gay or transgender characters or content was explicitly to send the message to the community that gay and transgender people were harmful to their fellow citizens, and to make the library hostile for gay and transgender individuals to access.

94. Starting January 1, 2024, by default, the age–restricted patron borrowing profiles would be applied to all new and existing RCLS patrons.

95. Also, during the August 28, 2023 meeting, the RCLS Board considered six individual reconsideration requests, and unanimously voted to remove four books entirely from the RCLS collection because they were purportedly in violation of the Murfreesboro Decency Ordinance, including, *Flamer* by Mike Curato, *Queerfully & Wonderfully Made* edited by Leigh Finke, *Let's Talk About It* by Erika Moen, and *This Book is Gay* by Juno Dawson.

96. The RCLS Board, including Defendant York, voted to keep the books from two other reconsideration requests in their current location in the RCLS collection: *An ABC of Equality* by Chana Ginelle Ewing (in the children's section) and *Gender Queer* by Maia Kobabe (in the adult section).

97. At this time, Defendants York and Piazza were on the RCLS Board and both voted in favor of the removal of the four books.

98. During the RCLS Board meeting on October 16, 2023, Ms. Shacklett expressed general staff concern about the new age-restricted patron policy that would affect 14,000 patrons and requested that the new age–restricted patron

borrowing profiles operate as an opt–in program instead of applying to all patrons by default. The Board denied the request.

99. Ten days after the lawsuit challenging the constitutionality of the Murfreesboro Decency Ordinance had been filed, during that RCLS Board meeting on October 16, 2023, Board member Lauren Brandon defended the RCLS Board's continued efforts to purportedly comply with the Murfreesboro Decency Ordinance, saying "we've already had people threaten to pull our funding."

100. The Chair of the RCLS Board, Mr. Sullvan, said that RCLS funding is provided on a year-to-year basis, and for the first time ever as far as he was aware, "we really do have a threat on the horizon that [funding] could be pulled."

101. After forty-eight years working for RCLS and twenty years as RCLS Executive Director, Ms. Shacklett retired on February 29, 2024. Mindy Barrett then served as RCLS Interim Director for the next seventeen months until Ms. James started as RCLS Executive Director on July 28, 2025.

102. On April 15, 2024, the RCLS Board met and voted to add RCLS policies prohibiting "child pornography," materials that were "pornographic for minors," or materials that were "obscene and harmful for minors," and requiring "age-appropriateness" reviews of materials with "sexual" content.

103. This language, just like the language of the Murfreesboro Decency Ordinance, was coded language to effectuate discrimination against gay and transgender persons.

104. During the meeting, Defendant York motioned to remove all mentions of the ALA from the entire RCLS policy manual.

105. Defendant York's proposal mirrored the national trend of libraries disassociating with the ALA because of its defense of books with LGBTQ characters and content.[17]

106. In fact, Defendant York explained exactly that — he made this motion because the ALA Bill of Rights conflicted with local community standards, *i.e.*, the anti-LGBTQ animus embodied in the Murfreesboro Decency Ordinance, which had been repealed in January of 2024.

107. Rather than approve Defendant York's motion in total, the RCLS Board voted to remove only the mention the ALA's opposition to age-based restrictions.

***Defendant York's Explicit Animus Against Gay and Transgender People***

108. Throughout 2024, Defendant York publicly framed gay and transgender people and books with such characters as threats to children, society, and his personal sectarian interpretation of Christianity.

109. For example, on May 29, 2024, Defendant York posted on the social media platform X (formerly Twitter) his belief that "[t]he world and its master is trying to sexualize our kids or to convince them to cut off their sexual organs" and that "[p]orn is being pushed to kids in libraries."

---

[17] *See* Mead Gruver, *Conservative book ban push fuels library exodus from national association that stands up for books*, ASSOCIATED PRESS (Sept. 5, 2023), https://apnews.com/article/library-book-ban-association-withdraw-7f5743a9e464433a745697f9111d7f6b.

Cody York reposted

**Cody York** @codyryanyork · May 29, 2024

Replying to @Particular_Drew

The world and its master is trying to sexualize our kids or to convince them to cut off their sexual organs. Altars to Satan are being erected in gov buildings. Porn is being pushed to kids in libraries. And so on...

The time for gracious fellowship with fellow Christians is now.

2 1 99

110. On June 16, 2024, Defendant York posted on X his belief that "Christian values or collapse. Only options I see."

**Cody York**

@codyryanyork

Because modern secular "free" society only exists because of the cultural inertia generated by Christian values. But as that inertia fails and those values disappear, so will secular "free" society. Christian values or collapse. Only options I see.

> **Smash Baals** @smashbaals · Jun 15, 2024
>
> Why do:
>
> -Muslims get Muslim nations
> -Jews get a Jewish nation
> -Hindus get Hindu nations...

8:01 AM · Jun 16, 2024 · **59** Views

2

111. On July 8, 2024, Defendant York posted on X that the "Biblical principles" that "Men should dress like men" and "Women should dress like women" "need to be articulated and encouraged."

**Cody York** @codyryanyork · Jul 8, 2024
Thank you for posting this.

These Biblical principles need to be articulated and encouraged.

> **Joshua Haymes** @haymes_joshua · Jul 7, 2024
> Men should dress like men.
>
> Women should dress like women.
>
> I understand why pagans hate this. ...



112. On July 24, 2024, posted about imagining what would happen if "some Christians" "burned an effigy of a drag queen reading to children."

**Cody York** @codyryanyork · Jul 24, 2024
And burned an effigy of a drag queen reading to children...

> **Brian Sauvé** @Brian_Sauve · Jul 24, 2024
> Can you imagine the show trials we would get if some Christian did this to a gay flag? x.com/rawsalerts/sta...

73

113. By September 19, 2024, Defendant Quesenberry was appointed to the RCLS Board as a City of Murfreesboro representative.

114. On September 23-24, 2024, Defendant York emailed Ms. Barrett, objecting to RCLS social media posts promoting the ALA's Banned Books Week, which has annually taken place in September or October since 1982.[18]

115. Recent ALA data shows that LGBTQ-related books are a major, recurring focus of book challenges, and accordingly books with gay or transgender characters or content tend to feature prominently in Banned Book Week displays and promotional materials.[19]

116. In his email to Ms. Barrett, Defendant York demanded to know the names of "all the staff involved in the creation and approval of these posts," and threatened that promoting Banned Books Week "could come off as insubordinate," so it was "not wise to continue."

***Defendants Escalate from Age Restrictions to a Systemwide Ban on Transgender-Related Materials***

117. On January 29, 2025, RCLS received a reconsideration request to remove the children's picture book *Me and My Dysphoria Monster: An Empowering Story to Help Children Cope With Gender Dysphoria* by Laura Kate Dale on the grounds that the material was "false info" and "showed the book to many, many people – They all agreed that it would cause harm to their children," which is coded language to effectuate discrimination against transgender persons.

---

[18] *See Banned Books Week Celebration*, AMERICAN LIBRARY ASSOCIATION, https://www.ala.org/events/banned-books-week (last visited Sept. 22, 2026).

[19] *See American Library Association kicks off National Library Week with the Top 10 Most Challenged Books of 2024 and the State of America's Libraries Report*, AMERICAN LIBRARY ASSOCIATION (Apr. 7, 2025), https://www.ala.org/news/2025/04/american-library-association-kicks-national-library-week-top-10-most-challenged-books.

118. *Me and My Dysphoria Monster* is a children's book that introduces gender dysphoria, which is the underlying medical diagnosis for transgender identity.

119. The Collection Development Manager of RCLS determined that *Me and My Dysphoria Monster* should remain in the children's section, and Ms. Barrett agreed. The patron disagreed and appealed the decision to the RCLS Board.

120. By March 17, 2025, Defendant Huddleston was appointed to the RCLS Board as a City of Murfreesboro representative.

121. On March 17, 2025, the RCLS Board voted five to two (one abstention) to entirely remove *Me and My Dysphoria Monster* from the RCLS collection.

122. At that time, Defendants York, Piazza, Quesenberry, and Huddleston were on the RCLS Board and voted to remove *Me and My Dysphoria Monster*.

123. During that meeting on March 17, 2025, Defendant York used the *Dysphoria Monster* reconsideration request as a springboard to ban broader swathes of books with gay and transgender characters and content from the RCLS collection.

124. Defendant York proposed a systemwide directive to remove all materials that acknowledged, discussed, or normalized transgender people or gender identity from the RCLS collection.

125. Defendant York repeated the coded language to effectuate discrimination against transgender persons written in the *Me and My Dysphoria Monster* reconsideration request. He claimed that the RCLS Board has an "obligation to protect children" because any book recognizing the existence of transgender individuals is "factually incorrect."

126. Defendant York then proposed that the RCLS Board direct RCLS staff to "remove materials that promote, encourage, advocate for, or normalize transgenderism or 'gender confusion' in minors" from the RCLS collection entirely.

127. The RCLS Board voted five to three to approve the removal of all materials mentioning or referring to transgender characters or gender identity from the RCLS collection.

128. At that time, Defendants York, Piazza, Quesenberry, and Huddleston were on the RCLS Board and voted to approve the removal.

129. The RCLS Board's decision to removal all content referring to or recognizing transgender individuals prompted the Freedom to Read Foundation, the National Coalition Against Censorship, American Booksellers for Free Expression, the Authors' Guild, PEN America, the Society of Children's Book Writers and Illustrators, and the Foundation for Individual Rights and Expression to send and/or co-author letters to the RCLS Board opposing its decision and warning the RCLS Board that the decision was a blatant constitutional violation.

130. Ever since Ms. Shacklett retired in February of 2024, the RCLS Board had not yet hired a new Executive Director. The RCLS Board's decision to ban all books referring to or recognizing transgender individuals also further delayed it. Earlier in the year, the RCLS Board had hired Deiters & Todd Library Consulting to run the search and hiring process. On March 26, 2025, Deiters & Todd Library Consulting withdrew its services and returned a $10,000 retainer to RCLS because the firm was appalled by the Board's decision to remove all material discussing gender identity or recognizing the existence of transgender persons.

131. On April 14, 2025, the RCLS Board held an executive session and met with its attorneys to discuss its decision to remove transgender-related materials and the letters the library district had received opposing that decision as unconstitutional.

132. According to the minutes for the executive session, Robert Burns, Esq. advised the RCLS Board to rescind its decision to remove all transgender-related materials, for multiple reasons, including but not limited to, his legal analysis that courts would find the action unconstitutional based on existing case law, a civil rights lawsuit was likely to be filed against the RCLS Board, and the RCLS Board's financial exposure would include payment of attorney fees to a prevailing plaintiff.

133. At that time, Defendants York, Piazza, Quesenberry, and Huddleston were on the RCLS Board and attended the executive session.

134. On April 21, 2025, the RCLS Board met and considered a motion to rescind its removal decision.

135. RCLS Board member Kory Wells said that she was concerned that the broad application to all RCLS materials violated the First Amendment.

136. The RCLS Board voted six to four to table further discussion until the meeting on June 2, 2025.

137. The reason for tabling further discussion until June was to allow Defendant York to confer with The American Center for Law and Justice (ACLJ).

138. The ACLJ is a politically conservative Christian legal organization founded by televangelist Pat Robertson.

139. "The ACLJ is particularly active in battles over marriage equality; the group helped draft the Defense of Marriage Act (DOMA), the federal law that defined marriage as the 'legal union of one man and one woman.'"[20]

140. Jay Sekulow joined the ACLJ in 1990 and has been Chief Counsel of the ACLJ since 2017.

141. In his capacity as Chief Counsel of the ACLJ, Mr. Sekulow wrote a memo entitled "Chief counsel's confidential report on the homosexual agenda," which accused institutions of promoting the "homosexual agenda," which he described as a "runaway train bent on destroying our communities." In the memo, Mr. Sekulow warned that "Homosexuals" were "out to destroy the family as we know it," writing that gay rights advocates intend to make America "the world's greatest promoter of every form of sexual deviancy." He insisted in the memo that "the state has a compelling interest to ban the act of homosexuality" and at minimum refuse "to promote the act that society deems destructive."[21]

142. The ACLJ offered to help Defendant York defend his removal of transgender-related materials.

143. On May 2 and 7, 2025, Defendant York checked out four children's picture books with gay or transgender characters or content: *Yes! No! A First Conversation about Consent* by Megan Madison, *Julian Is a Mermaid* by Jessica Love,

---

[20] *The Legal Arm of the Christian Right*, POLITICAL RESEARCH ASSOCIATES (Nov. 5, 2012), https://web.archive.org/web/20251116090422/https://politicalresearch.org/2012/11/05/the-legal-arm-of-the-christian-right-inside-the-american-center-for-law-and-justice.
[21] *Id*.

*Pride Puppy* by Robin Stevenson, and *The Rainbow Parade* by Emily Neilson. As before, he hid all four books in his office in the Rutherford County Government building.

144. On May 29, 2025, Defendant Duffield submitted her application for appointment to the RCLS Board as a Rutherford County representative. In her application she listed as her first of two reasons: "To ensure the books available in our county libraries are age appropriate and serve to educate and not indoctrinate," using the coded language for the goal she and the other Defendants shared, to censor transgender-related materials.

145. On June 2, 2025, the RCLS Board met again to consider rescinding its resolution to "remove materials that promote, encourage, advocate for, or normalize transgenderism or 'gender confusion' in minors."

146. During the discussion, Defendant York advocated for rescinding the resolution, explaining that the RCLS Board had "been advised by multiple attorneys that there's a chance that the action we took would not withstand a legal challenge particularly because it could be viewed as being inconsistent with our policies." Defendant York continued, "I and many other of the board members are committed to protecting children in our community from inappropriate material. And to best achieve that goal, we need to rescind our previous action, and to take a different approach. Specifically, rewriting our policies from the ground up. This will allow us to more efficiently address the question of inappropriate material globally and will allow us to move forward with a solution that will better withstand a legal challenge," a euphemism for his goal to eliminate all transgender-related materials and circumvent the legal advice the RCLS Board had received.

147. One RCLS Board member, Kory Wells, said that the RCLS Board had already spent $8,000-$10,000 on legal fees related to the original decision to remove the literature.

148. Defendant Quesenberry said, "I used to teach school, first grade, . . . and I will always vote to ban a book that I would not read to my first-grade students."

149. According to the meeting minutes, "The motion to rescind passed, nullifying the March 17, 2025, resolution to 'remove materials that promote, encourage, advocate for, or normalize transgenderism or 'gender confusion' in minors.'" Defendant York voted to rescind. Defendant Piazza abstained.

150. At the June meeting, the RCLS Board also elected officers for the 2025-26 term, from July 1, 2025, to June 30, 2026. The RCLS Board voted five to three to anoint Defendant York as Chair; voted unanimously for Defendant Huddleston to serve as Vice-Chair; and voted unanimously for Defendant Quesenberry to serve as Secretary.

***Defendants Hire Ms. James as RCLS Executive Director***

151. On June 7, 2025, the RCLS Board interviewed Ms. James in person in Murfreesboro, Tennessee and voted to hire her.

152. Defendant York abstained from the vote. All other RCLS Board members voted in favor of hiring Ms. James.

153. On June 9, 2025, the RCLS Board offered Ms. James the Executive Director position with a start date of July 28, 2025.

154. In June 2025, at her own expense, Ms. James relocated her family from South Carolina to Tennessee.

155. She believed her new position as the RCLS Executive Director would be the final chapter of her rewarding professional career. Regrettably, she did not know what was coming.

### *Defendants Quickly Demand Ms. James "Get Rid of" All Children's Books with Gay and Transgender Characters and Content from the RCLS Collection*

156. On June 20, 2025, Defendant Wiencek submitted his application for appointment to the RCLS Board. Notwithstanding the decision to repeal the March 17, 2025 resolution against transgender materials, in his cover letter, Defendant Wiencek specifically referenced the RCLS Board meeting on June 2, 2025, and Defendant York's statement about changing policies from the ground up to accomplish the removal of transgender materials: "I seek to help the Board refine policies and procedures discussed in the latest Board meeting to better support these goals."

157. On July 1, 2025, Defendants Duffield and Defendant Thomas began their terms on the RCLS Board, as a Rutherford County representative and a City of Murfreesboro representative, respectively.

158. The month before Ms. James began her tenure as RCLS Executive Director, the RCLS Board approved a reconsideration request for a board book, *i.e.*, a book made of thick, rigid cardboard designed for infants and toddlers.

159. The book in question, *Being You: A First Conversation About Gender* by Megan Madison and Jessica Ralli, was challenged on July 17, 2025, by a censorship activist on the grounds that:

> The book goes over the genitals and how they do not determine your sex. This is false, scientifically. It goes over confusing pronouns, encouraging babies to use them, and bathrooms that are not appropriate for their sex. It says your parents and doctors "guessed" at

your sex when you were born and using just "boy and girl" is harmful. It encourages trans children, using that term.

160. On July 21, 2025, the RCLS Board met and voted to remove *Being You* from the RCLS collection.

161. At this time, Defendants Duffield, Huddleston, Piazza, Quesenberry, Thomas, and York were on the RCLS Board and voted to remove *Being You*.

162. The following week, on July 28, 2025, Ms. James started work.

163. On July 29, 2025, two days into the job, Ms. James met Defendant York for lunch in Murfreesboro.

164. During the lunch meeting, Defendant York informed Ms. James of his vision for her first year as the RCLS Executive Director.

165. He described to Ms. James that he wanted her to "get rid of" all books from RCLS that "created gender confusion," discussed "transitioning of genders," gay and lesbian relationships, and similar books with similar subjects in the RCLS collection, calling them "harmful" to children.

166. Defendant York told Ms. James that such books were "inappropriate" for children.

167. He told Ms. James that he could accomplish whatever he wanted because he had the support of the RCLS Board and had secured their votes for any motion he proposed.

168. At the end of the conversation, Defendant York reminded Ms. James that she was still in the probationary period of her employment.

169. Taken together, Defendant York's statements to Ms. James insinuated that she would be terminated or cause the library system to cease operating if she did

not capitulate, even though she had just relocated her family about 400 miles at her personal expense.

170. After the lunch meeting, Defendant York walked Ms. James to his office at the Rutherford County Government building.

171. In his office, Defendant York handed Ms. James the four children's books that he had personally checked out and hidden in his office in May 2025. Given that it was July 29, 2025, it was well past their due date. The books had already been designated by the library district as "lost" within its computer system.

172. The four books were *Yes! No! A First Conversation about Consent* by Megan Madison, *Julian Is a Mermaid* by Jessica Love, *Pride Puppy* by Robin Stevenson, and *The Rainbow Parade* by Emily Neilson.

173. Defendant York had checked out those four books and held on to them for so long to prevent others from being able to do so.

174. Defendant York demanded that Ms. James remove all four books from the RCLS collection because they promote "gender confusion."

175. On August 7, 2025, Ms. James received an email from Defendant York stating that he wanted to schedule regular one-on-one meetings with her to discuss the RCLS Board agenda in advance of RCLS Board meetings.

176. On August 13, 2025, Ms. James met Defendant York for their first one-on-one meeting in Defendant York's office at the Rutherford County Government building.

177. During this meeting, which took place in Ms. James's second week of employment as the RCLS Executive Director, Defendant York directed Ms. James to

remove three books that Defendant Quesenberry wanted removed from the RCLS collection, characterizing them as "harmful" to children.

178. Back in July of 2025, Defendant Quesenberry had three censorship activists who were her friends initiate the reconsideration process for *ABC of Gender Identity* by Devika Dalal, *The Every Body Book of Consent* by Rachel Simon, and *Gender Identity* by Char Light, *i.e.*, two children's picture books and one non-fiction history of gender roles intended for ages twelve to seventeen.

179. The reconsideration request for *ABC of Gender Identity* by Devika Dalal called the book "confusing to young children" because there "are not 26 different genders" and "Much untruth in this book." It asks for the book to be "taken out" of the RCLS collection.

180. The reconsideration request for *The Every Body Book of Consent* by Rachel Simon called the book "not appropriate for children" because the author is "sneaky" and "this book is interwoven with LGBTQ ideas."

181. The reconsideration request for *Gender Identity* by Char Light asked for the book to be removed because "The whole book is gross!" and "It's awful to expose people especially children to such confusion…There are not more than two types of human bodies."

182. During his one-on-one meeting with Ms. James on August 13, 2025, Defendant York disclosed to Ms. James that Defendant Quesenberry coordinated with her friends to submit the reconsideration requests and instructed Ms. James to immediately remove the books without following the full reconsideration process.

183. By August 14, 2025, Defendant Wiencek was appointed to the RCLS Board as a Rutherford County representative.

184. On August 27, 2025, during Ms. James' one-on-one meeting with Defendant York, he showed Ms. James social media posts about the ALA's Banned Book Week on the RCLS Facebook page and insisted that the RCLS staff member responsible for the postings be fired for "direct violation" of his orders as Chair of the RCLS Board and for "disrespecting the values of the entire Board." Defendant York further instructed Ms. James to remove all ALA Banned Book Week posts and demanded that no RCLS staff participate in the ALA's Banned Book Week.

185. Defendant York found the content of Banned Book Week posts on the RCLS Facebook page distasteful and objectionable based on his personal ideological beliefs.

186. From the context of the instructions, Ms. James understood that Defendant York did not want RCLS to express understanding of LGBTQ individuals publicly, including on social media.

187. During that one-on-one meeting, Defendant York also instructed Ms. James to immediately remove the book *Forever* by Judy Blume from the RCLS collection even though the RCLS Board had previously voted to keep the title in the collection, arguing he had not been Chair at the time of the vote, and that he disagreed with the decision.

188. By September 23, 2025, Defendant Curtis was appointed to the RCLS Board as a City of Eagleville representative.

***Defendant Quesenberry Probes Ms. James' Religious and Political Beliefs and Ethnic Heritage while Celebrating Initial Success "Get[ting] Rid of" Children's Books with Gay and Transgender Characters or Content***

189. On October 2, 2025, Defendant Quesenberry invited Ms. James to have lunch with her.

190. During lunch, Defendant Quesenberry questioned Ms. James about her religious faith and offered to help Ms. James find a church.

191. Defendant Quesenberry also asked Ms. James about her political affiliation, whether she was registered to vote in the county, and who she had voted for in the last election.

192. Defendant Quesenberry further informed Ms. James that she had heard Ms. James was originally from South Texas and was curious to know if Ms. James had any "Hispanic blood."

193. Defendant Quesenberry told Ms. James that she had asked three of her friends to submit reconsideration requests for books Quesenberry falsely characterized as "pornographic."

194. She went on to inform Ms. James that she knew Defendant York had directed Ms. James to remove those "pornographic" books from the RCLS collection outside of the formal reconsideration process, and thanked Ms. James for doing so.

195. Defendant Quesenberry falsely referred to books that discussed gender identity and pronouns as "pornography," not because they were obscene, but in hopes that doing so would provide a smokescreen to justify censorship of the books despite constitutional protections.

196. Defendant Quesenberry believed that any book with gay or transgender characters or content is inherently pornographic.

197. For example, she described a children's picture book with an image of a transgender man with facial hair and a baby bump as "pornography."

198. The false characterization of an illustration of a fully-clothed bearded pregnant person as "pornography" proves that the concern was not with age-appropriateness or educational value, but with the viewpoint expressed, i.e., the acknowledgement of the existence of transgender persons.

199. It became clear to Ms. James that Defendant Quesenberry's concerns were not genuinely about ensuring no obscene materials fell into the hands of children.

200. Defendant Quesenberry objected to materials as "pornography," not because of any allegedly sexually inappropriate content, but because they acknowledged the existence of individuals that she personally believed to be immoral, exposing her true goal of eliminating heterodox thought in the community and enforcing strict orthodoxy to her own personal ideologies across the wider community.[22]

---

[22] On November 14, 2025, Ms. James filed an ethics complaint with the City of Murfreesboro against Defendant Quesenberry for her conduct during this lunch meeting. Upon learning of the complaint, Defendant Quesenberry emailed Ms. James and, without denying any allegation in the complaint, explained that her intent in holding the meeting had been to help Ms. James find "ways to get involved with like-minded people."

201. Defendants York and Quesenberry's covert coordination to influence reconsideration requests was based on ideological bias rather than established policy or professional standard.

***Mayor Carr Applies Funding Pressure to "Clean Up" the RCLS Collection***

202. On October 7, 2025, Defendant York introduced Ms. James to the Mayor of Rutherford County, Joe Carr.

203. During this introductory meeting, Mayor Carr inquired of Ms. James what she was doing to "clean up" the RCLS collection.

204. During the meeting, Mayor Carr wondered aloud what else he could fund with the $2 million in funding Rutherford County annually provides RCLS instead of funding the library district.

205. Taken together, Mayor Carr's statements were intended to exert pressure on Ms. James to remove children's books with gay and transgender characters and content from the RCLS collection because failing to do so would threaten the library district's funding.

***RCLS Inventories its Children's Section***

206. On October 20, 2025, the RCLS Board against discussed removing all mention of the ALA from RCLS policies.

207. During the discussion, Defendant York clarified his opposition to the ALA was based on his disagreement with the ALA's support of LGBTQ people and content, including those books highlighted during Banned Book Week.

208. He acknowledged the removal of any reference to the ALA in library policies is "happening all over the place" and said the "value set of the [ALA] is inconsistent with Rutherford County values."

209. To explain, Defendant York said, "this body has voted and adopted a graduated card system that is in direct opposition to the right to read" and that during "Banned Book Week [the ALA] advertise[s] books that this body has removed from the library as being inappropriate and they advocate those books and encourage their presentation to children."

210. On October 27, 2025, Tennessee Secretary of State Tre Hargett sent a letter directing RCLS (and all other libraries in Tennessee Regional Library System) to conduct a review of all materials in its children's section, identify materials potentially inconsistent with Tenn. Code Ann. §§ 49-6-3801-03 ("Tennessee Age-Appropriateness Materials Act of 2022")[23] or Executive Order 14168 ("Defending Women from Gender Ideology Extremism and Restoring Biological Truth to the Federal Government") , provide the RCLS Board a report, initiate the reconsideration process for any challenged materials, and submit a final report to the Secretary of State's office by January 19, 2026 (the Hargett Review).

211. For context, Executive Order 14168 reflects animus against transgender persons. President Trump has repeatedly referred to transgender

[23] While not cited in this letter, Tenn. Code Ann. §§ 49-6-3801-03, is cited during a November 13, 2025 meeting with the Tennessee State Librarian and Archivist James Ritter and in a letter Secretary Hargett sent RCLS on December 17, 2025, both of which are discussed below.

persons using derogatory labels, describing them as "deranged" and "sick,"[24] and he has issued several orders targeting transgender persons.[25] Executive Order 14168 is deeply rooted in that same animus against transgender persons. It refers to transgender persons as "ideologues who deny the biological reality of sex," inaccurately and offensively states that transgender persons live as their true gender to "gain access to intimate single-sex spaces," with the implication that they do so for nefarious reasons, and to "depriv[e] [women] of their dignity, safety, and well-being," and says that merely existing as a transgender person is to "attack women."

212. In the letter, Secretary Hargett provided one example of a book that had been brought to his attention and was "worthy of review," *Fred Gets Dressed* by Peter Brown.

213. *Fred Gets Dressed* is a children's picture book recommended for children in pre-school through first grade. The story is about a little boy who tries on his parents' clothes and dresses up in his mom's clothes, jewelry, and makeup.

214. The solitary inclusion of *Fred Gets Dressed* and Executive Order 14168 illuminates the discriminatory intent of the Hargett Review, to target books that acknowledge the existence of gay, non-binary, and/or transgender people.

---

[24] *See Fact Sheet: Donald Trump on LGTBQ Issues: Transgender Americans*, GLAAD (Aug. 20, 2024), https://glaad.org/fact-sheet-trump-transgender.

[25] *See* Exec. Order 14,148, Initial Rescissions of Harmful Executive Orders and Actions, 90 Fed. Reg. 8237 (Jan. 20, 2025) (rescinding Biden Administration executive orders protecting transgender people); Exec. Order 14,170, Reforming the Federal Hiring Process and Restoring Merit to Government Service, 90 Fed. Reg. 8621 (Jan. 20, 2025) (prohibiting governmental employers from considering gender identity in hiring); Exec. Order 14,190, Ending Radical Indoctrination in K-12 Schooling, 90 Fed. Reg. 8853 (Jan. 29, 2025) (prohibiting teaching of transgender-related topics in schools).

215. On November 3, 2025, Ms. James met with Defendant York to discuss RCLS's execution of the Hargett Review.

216. During that meeting, Defendant York and Ms. James discussed a plan to meet the Hargett Review deadline, including by closing RCLS's two largest branches for one week each, consecutively, so staff could physically review materials in the children's section during regular working hours and without overtime.

217. Defendant York then directed Ms. James to create a spreadsheet of each title reviewed that included the names of the RCLS employees who reviewed each title, so that the public could make open records requests that identified each staff member who reviewed disfavored books, what the staff member recommended, and why the recommendation was made.

218. Ms. James refused to do so because she feared doing so would expose RCLS employees to harassment.

219. Defendant York then instructed Ms. James to describe how each title in the spreadsheet violated Tenn. Code Ann. §§ 49-6-3801-03 or Executive Order 14168.

220. Ms. James told Defendant York if she did that then RCLS would be sued.

221. Ms. James also suspected that litigation would ensure if books were removed from the shelves a result of their LGBTQ and other protected content, so she asked Defendant York if RCLS staff could store all removed materials in the event a court ordered the books be returned to the shelves, thus preserving RCLS financial resources.

222. In response, Defendant York fumed that he would rather "step down" from the RCLS Board and make it his "life's mission to shut the libraries down" than follow a court order that required him to put "gender confusing" books back on the shelves.

223. Defendant York told Ms. James that he did not know and did not care what would happen if RCLS failed to follow a court order to reshelve books.

224. On November 8, 2025, Defendant York emailed Ms. James directing her that "books in violation of" Executive Order 14190 ("Ending Radical Indoctrination in K-12 Schooling"), which only pertained to school libraries, "will need to be included in the material we need to be looking for" in the Hargett Review.

225. Executive Order 14190 is not content neutral but prohibits teaching transgender content in schools and is motivated by bias against transgender persons. For example, the order describes gender dysphoria, which is the underlying medical diagnosis for transgender identity as "instances" in which "young men and women are made to question whether they were born in the wrong body and whether to view their parents and their reality as enemies to be blamed," and "practices" that "not only erode critical thinking but also sow division, confusion, and distrust, which undermine the very foundations of personal identity and family unity."

226. In directing Ms. James to use the order to execute the Hargett Review, Defendant York intended to suppress certain viewpoints and content that he referred to as "gender confusion" because he disagreed with it.

227. In response, Ms. James objected and pointed out that the order pertains to public schools, not public libraries.

228. On November 3, 2025, Jamie Ritter, the Tennessee State Librarian, held a call with public libraries across the state. During the call, he acknowledged that Tenn. Code Ann. §§ 49-6-3801-03 did not apply to public libraries but that he "need[ed] all of you to kind of read between the lines," and review their collections for materials with "gender ideology" content regardless.

229. On November 14, 2025, Defendant York followed up on his directives from November 3, 2025, and instructed Ms. James to describe how each title in the spreadsheet violated Tenn. Code Ann. §§ 49-6-3801-03, Executive Order 14168, or Executive Order 14190.

230. On November 18, 2025, Ms. James returned a missed call from Defendant York.

231. During the phone call, Defendant York instructed Ms. James to return the book *Forever* by Judy Blume back to the shelf and then asked her if the book would be part of the Hargett Review, insinuating that he expected it to be removed again through the formal review process.

232. *Forever* is not a children's book; it is a young adult book and therefore was not technically subject to the Hargett Review of the children's section.

233. Ms. James asked Defendant York to reshelve all the other books that Defendant York had required her to remove as well. Defendant York agreed but made it clear he expected them all to be removed again as part of the more formal Hargett Review.

234. In November 2025, RCLS staff completed the first step of the Hargett Review and physically reviewed roughly 60,000 items.

235. Approximately 2,200 titles were flagged and pulled from the shelves of the children's section for Ms. James' review and recommendation to the RCLS Board and the RCLS Board's decision to accept/reject Ms. James' recommendation whether to keep each title in the children's section of the RCLS collection, move it to the young adult section, or move it to the adult section.

236. On November 24, 2025, a member of the community emailed the RCLS Board "advocat[ing] for the removal of obscene book content from our public libraries," calling the books "pornographic" and "garbage," not because the books were obscene but as coded language, as discussed above, saying that the "small percentage" of the community who wanted to keep that content in the RCLS collection were of "low morality."

237. In response, carbon copying the RCLS Board, Defendant York thanked that individual: "I'm grateful for your willingness to stand firm on this issue." Defendant York also invited him to "come early to get a seat" at the next RCLS Board meeting using the coded language discussed previously, saying, "This is an important moment for our community. If you are able, your presence at the meeting will be a great encouragement. Many who are attending will be wearing white to show their support for protecting children. Thank you again for standing with us."

238. Defendant York's response reflects a coordinated effort by Defendants to advance a personal ideological agenda. The email confirms that members of the RCLS Board were not simply responding to community input but were actively exploiting the power of their offices to render RCLS hostile to protected minority groups and to suppress access to books and ideas that conflicted with their narrow

political, religious, and culture beliefs and working to reshape the RCLS collection into a tool for promoting that agenda.

239. After receiving Defendant York's email, Defendants Wiencek, Huddleston, Thomas, and Curtis all wore white to every RCLS Board meeting.

240. At the RCLS Board meeting on December 1, 2025, before discussing the Hargett Review, RCLS Board member Allison Belt asked Ms. James whether she witnessed any misconduct by Board members.

241. In response, Ms. James recounted her lunch meeting with Defendant York on July 29, 2025, and his subsequent ongoing orders to remove books from the RCLS collection.

242. Defendant York then responded to Ms. James, claiming that Ms. James had simply confused his personal musings about specific books titles with direct orders to initiate reconsideration requests.

243. After Ms. James spoke, the RCLS Board voted on whether to remove Defendant York as Chair of the RCLS Board, but the motion failed two to seven (Defendant York abstained).

244. Later during the meeting, Ms. James explained that RCLS staff physically reviewed 60,000 books and approximately 2,200 titles were flagged and pending Ms. James' review and recommendation to the RCLS Board, and then the RCLS Board's decision whether to accept Ms. James' recommendations.

245. In the meantime, RCLS continued adding materials to its collection per its collection development policies, including ordering 845 items in November 2025.

246. On December 4, 2025, Defendant Quesenberry asked Ms. James in an email how the 845 items ordered for the RCLS collection in November 2025 were "chosen and by whom. Who decided these were the correct books to add?"

247. On December 5, 2025, in response to Ms. James' question why Defendant Quesenberry needed that information, Defendant Quesenberry replied using the "inappropriate materials" coded language previously discussed: "So we don't keep having to deal with inappropriate materials . . . I'll keep asking as long as inappropriate materials show up in our libraries." By "inappropriate materials," Defendant Quesenberry meant children's books with gay and transgender characters and content.

248. On December 17, 2025, Secretary Hargett sent a letter to Ms. James and Defendant York, carbon copying the RCLS Board.

249. In the letter, Secretary Hargett expressed "concern" that the Hargett Review, as RCLS executed it in accordance with Defendant York's instructions, was "so far beyond" his guidance and "will unnecessarily and substantially delay the community's access to books."

250. The letter went on to read, "we were surprised to hear that [RCLS] identified 2,200 books out of 60,000 reviewed that required further review. This is indeed concerning." It "suggests a potentially overly broad review inconsistent with the direction from the Tennessee State Librarian and Archivist. And it goes without saying that removing this many materials from the collection while a further review takes place prevents your community from accessing materials."

251. The letter expressly stated that RCLS's "approach is inconsistent with the guidance provided by the Tennessee State Librarian and Archivist and is very different than the review of the other library systems in this state. **. . it is clear that this review is not the review that we requested**." (emphasis added)

252. In December 2025, the RCLS Board requested physical copies of the 2,200 books to be delivered to them, so they could review each book.

253. On Monday, January 5, 2026, Defendant York emailed a list of over 200 books he personally "need[ed]" to review, asking Ms. James to pull and box them.

254. On Tuesday, January 13, 2026, Defendant Duffield emailed a list of an additional fifty books that had not been flagged for review and that she wanted Ms. James to pull and box for her to review, removing additional books from the shelves and checking them out on Defendant Duffield's personal library card.

255. On February 2, 2026, the RCLS Board met and discussed Ms. James' recommendations from the Hargett Review.

256. Ms. James presented the list of more than 2,200 titles and recommended that most should remain in the children's section, 444 should be moved to the young adult section, and 6 should be moved to the adult section.

257. The RCLS Board voted to accept Ms. James' recommendations for all children's books reviewed as part of the Hargett Review. The vote included a caveat, (presented by Defendant York), however, providing that any RCLS Board member could ask for the RCLS Board to decide whether a book reviewed as part of the Hargett Review should remain in the children's section, be relocated to the adult section, or

be entirely removed from the RCLS collection, and that future decision would supersede the current decision.

258. Defendant York then announced that he had created a list of books and testified that he was "advocating" that "any book that promotes gender confusion" be entirely removed from the RCLS collection. He clarified that he meant "anything that says a boy can be a girl or a girl can become a boy" and "anything that talks about pronoun usage" and "nonbinary characters" and "trans characters." He claimed that his list included those such books.

259. On March 13, 2026, Defendant York again asked the public to attend the RCLS Board meeting and wear white to show their support for the RCLS Board "addressing inappropriate material," which Defendant York had defined to mean anything that acknowledges the existence of non-binary or transgender persons.

260. Prior to the RCLS Board's meeting on March 17, 2026, Defendant York provided a list of 116 books (the list he discussed during the prior meeting), and Defendant Duffield provided a second list of 16 books (using coded concern of "age appropriateness"). About 6 books overlapped between the two lists, including, for example, a children's picture book that introduces young children to the concept of gender identity called *It Feels Good to Be Yourself: A Book About Gender Identity* by Theresa Thorn.

261. In response, Ms. James emailed the RCLS Board informing its members that per RCLS policy, individual reconsideration requests must be submitted for each title to initiate the reconsideration process.

262. Defendant York stated the because of the RCLS Board's vote on February 2, 2026, the RCLS Board could now decide to remove all titles on his list from the RCLS collection if it so chose.

263. During its meeting on March 16, 2026, the RCLS Board voted eight to three to remove the ALA Bill of Rights (which protects the right to read) and all ALA language from the RCLS policy. In doing so, the RCLS Board sought to eliminate any internal inconsistencies or conflicts between removing disfavored materials from the RCLS collection and the library district's own written policies.

264. Defendant York's list of books to remove included a column titled "FLAGGED," which described the discriminatory animus motivating Defendant York's effort to remove the items on his list from the RCLS collection entirely.

265. The "FLAGGED" column includes the following description of reasons for the removal of a book: "female empowerment discussion," "LGBTQIA+," "nonbinary teen," "gay rights movement," "Diverse children in urban setting," "identity," "classroom discussion of book bans and censorship," "graphic depiction of lynching," "partially clothed humanoid," "LGBTQ themes," "LGBT+," "LGBTQ people," "Activist Artwork," "discussion about sex ed," "depression and bullying," "diversity and inclusion," "Trans Medical Doctor historical true story," "Discussion of female's anatomy," "Gender identity," "Gender expression," "mystical creatures, mild violence, non-binary," "Genderfluidity," "Discussion of human body," "gender diversity and transgender/non-binary identities," "nongender conforming," "gender exploration," "family discussions about trans," "inclusion," "gay couple," "LGBTQ content," "nonbinary," "boy in a dress," "LGBQ+," "transgender girl," "unspecified reason to be

removed by Tre Hargett," "aromantic-asexual," "inclusivity and diverse representation," "transgender," "gender fluidity," "social-justice concepts: Letters G, L, S, T," "image of a child with 2 moms, mention of transgender," "Gender Spectrum explained," and "same-sex couple." Thus, in no uncertain terms did Defendant York target books for removal based on viewpoint and content he did not agree with.

266. During the meeting, Defendant York maligned transgender identity, stating, "Boys can't be girls. That's not accurate. These are dangerous things to tell a child."

267. He complained that all the books on the list he was propounding "promote gender confusion in some way" and argued they should be relocated from the children's section to the adult section of the RCLS collection or removed from the RCLS collection entirely.

268. He concluded that books discussing "gender confusion" and "telling someone that boys aren't really boys . . . and that you advocate for [or] encourage the dismembering of healthy sexual organs," were inappropriate for children.

269. Multiple titles on Defendant York's list had already been subjected to the reconsideration process and the RCLS Board had already voted to keep those titles located in the children's section of the RCLS collection.

270. For example, an alphabetic picture book, *An ABC of Equality* by Chana Ginelle Ewing, was on Defendant York's list. But on August 28, 2023, the RCLS Board had already discussed a reconsideration request relating to the book and voted to keep the book located in the children's section. Now, however, Defendant York argued

*An ABC of Equality* should be removed from the children's section of the RCLS collection or removed from the RCLS collection entirely.

271. As another example, *Making a Baby* by Rachel Greener was on Defendant York's list of books that "promote gender confusion in some way" even though four years prior, on February 10, 2022, the RCLS Collection Development Coordinator had already explained to him that the book rightfully belonged in the children's section.

272. During the meeting, the RCLS Board voted eight to three to relocate all the books on Defendants York and Duffield's lists, approximately 130 in total, from the children's section to the adult section of the RCLS collection.

273. Defendants Curtis, Duffield, Huddleston, Piazza, Quesenberry, Thomas, Wiencek, and York attended the meeting and voted to relocate the books.

274. On March 18, 2026, Ms. James emailed the RCLS Board and RCLS staff objecting to the directive, stating: "I will not comply with the Board's decision to relocate these books."

275. Ms. James spoke out against the discriminatory, unconstitutional nature of the RCLS Board's directive, and supported the rights and dignity of gay and transgender individuals.

276. In her email, Ms. James expressed her rationale as follows:

> As the Director of the Rutherford County Library System (RCLS), I am professionally and ethically bound to uphold the First Amendment of the U.S. Constitution.
>
> Public libraries serve as vital repositories of diverse ideas, both popular and unpopular. Restricting access to these materials through subjective relocation or removal constitutes a violation of the community's right to information and a direct infringement on the principles of free

> speech. Our libraries are funded by and for the citizens; therefore, the right to access information—free from government interference—is a protected hallmark of our democracy.
>
> The 8-3 vote by the Library Board on March 16th to relocate over 100+ LGBTQIA children's titles to the adult section is a clear act of viewpoint discrimination. Furthermore, the vote to move the books was done without following the library's established Request for Reconsideration policy.
>
> My duty to protect public access is not merely a personal opinion; it is a core tenet of the American Library Association's Code of Ethics. As an arm of the county government, the Board cannot legally limit the public's access to materials owned by the people based on the content of the ideas expressed within them.

277. On March 19, 2026, Defendant York replied to Ms. James' email instructing her that, "[t]he Board is responsible for establishing policy and direction for the library system, and the Director is responsible for carrying out those decisions."

278. Defendant York called for a special meeting of the RCLS Board to discuss disciplinary action against Ms. James for her refusal to follow the RCLS Board's "lawful vote on March 16, 2026, directing the relocation of certain materials within the library system."

279. On March 30, 2026, the RCLS Board voted eight to three to terminate Ms. James' employment as RCLS Executive Director.

280. Defendants Curtis, Duffield, Huddleston, Piazza, Quesenberry, Thomas, Wiencek, and York attended that meeting and voted to terminate Ms. James.

281. The reason for Ms. James' termination was reiterated in her termination letter which stated that the reason for her termination was due to insubordination for her refusal to follow the RCLS Board's "legally binding vote" to

relocate approximately 130 books from the children's section to the adult section in the RCLS collection.

282. The decision to fire Ms. James was rooted in Defendants' animus toward gay, non-binary, and transgender persons and in retaliation against Ms. James for associating with and defending them, as well as for refusing to participate in unlawful discrimination and unconstitutional censorship.

283. On March 31, 2026, Defendant York reposted celebrations of the firing of the "sick," "rotten," and "You-know-what" Ms. James.



284. Posting on X on April 1, 2026, Defendant York gloated that a “Leftist Crowd Melts Down After Librarian Fired for Pushing Trans Agenda on Kids,” calling it the “Best reporting” he had “seen on the story so far.”

Cody York @codyryanyork

Best reporting in have seen on the story so far.




From dailywire.com

4:08 PM · Apr 1, 2026 · **105** Views

285. On June 1, 2026, Defendant York again manifested his animus against LGBTQ people, posting on X that Tenesse is a “great state” because it “ranks among worst states for LGBTQ+ people.”

**Cody York** @codyryanyork

The Great State of Tennessee

> **Tennessean** @Tennessean · Jun 1
> Tennessee ranks among worst states for LGBTQ+ people, risking $14.4B in income tennessean.com/story/money/bu...

8:50 PM · Jun 1, 2026 · **39** Views

286. On June 1, 2026, Defendant York again reiterated his animus against LGBTQ people, celebrating on X that Tennessee had rebranded June from Pride Month to “Nuclear Family Month.”




287. After Ms. James' termination, the approximately 130 books from Defendants York and Duffield's lists were pulled off the shelves of the children's section to be catalogued in the adult collection.

288. Further, the RCLS Board has since applied even greater age restrictions on patron borrowing than its 2023 age-restricted borrowing profiles, *i.e.*, the age restrictions purported to comply with the since-repealed Murfreesboro Decency Ordinance.

289. On May 11, 2026, the RCLS Board redefined "young adult" to be patrons aged eighteen to twenty-five years old. As a result, materials previously available to

patrons aged thirteen to seventeen years old will be restricted to those over eighteen years old.

290. Defendants' discrimination against gay, non-binary, and transgender persons is ongoing.

## CLAIMS FOR RELIEF

## FIRST, SECOND, AND THIRD CLAIMS FOR RELIEF

42 U.S.C. § 2000e *et seq.*
Discrimination, Retaliation, and Anticipatory Retaliation on the Basis of Sex in Violation of Title VII of the Civil Rights Act of 1964
(Against Defendants Rutherford County Library System and The Board of Directors of Rutherford County Library System)

291. Ms. James hereby incorporates all other paragraphs of this Complaint as if fully set forth herein.

292. Ms. James alleges claims under Title VII of the Civil Rights Act of 1964 similar in nature, including associational, advocacy, and retaliatory discrimination (including anticipatory retaliation), as those described in the claims under 42 U.S.C. § 1983 for sex (including sexual orientation and gender identity) discrimination.

293. Among other acts of discrimination and retaliation alleged herein, Defendants were antagonistic towards Ms. James and her protected activities, encouraged others to be so as well, and ultimately terminated Ms. James' employment.

294. Defendants' discriminatory animus towards protected classes, including LGBTQ individuals, was a motivating factor of Defendants' adverse actions against Ms. James, and their retaliatory animus was the but-for causation for the same.

295. Defendants' actions, as alleged herein, were undertaken with malice or reckless disregard for Ms. James' federally protected rights.

296. As a result of Defendants' conduct, Ms. James suffered actual economic damages and suffered other injuries, damages, and losses, including severe emotional distress and pain and suffering in an amount to be proved at trial.

**FOURTH, FIFTH, AND SIXTH CLAIMS FOR RELIEF**
42 U.S.C. § 1983
Discrimination, Retaliation, and Anticipatory Retaliation on the Basis of Sex in Violation of the Fourteenth Amendment's Equal Protection Clause
(Against All Defendants)

297. Ms. James hereby incorporates all other paragraphs of this Complaint as if fully set forth herein.

298. At all times relevant to this claim, Defendants were acting under color of state law.

299. The Equal Protection Clause of the Fourteenth Amendment to the U.S. Constitution protects individuals who oppose discriminatory practices against, advocate on behalf of, and associate with protected classes. Likewise, the Equal Protection Clause protects individuals who make it reasonably apparent that they will continue to engage in such protected activities.

300. The Equal Protection Clause recognizes sex as a protected class. With respect to sex, the Supreme Court in *Bostock v. Clayton County, Georgia* held that "discrimination based on homosexuality or transgender status necessarily entails discrimination based on sex . . . ." 590 U.S. 644, 679 (2020); *see also Olivarez v. T-mobile USA, Inc.*, 997 F.3d 595, 598 (5th Cir. 2021) (applying *Bostock*). Treating transgender female persons different than biologically female persons makes a sex-

based classification that triggers immediate scrutiny. *See W. Virginia v. B. P. J.*, 146 S. Ct. 2356, 2374 (2026) ("And the laws limit women's and girls' sports teams to biological females. In doing so, the laws make a sex-based classification that triggers intermediate scrutiny.").

301. At all times relevant to this claim, Ms. James enjoyed federal rights to oppose discriminatory practices against protected LGBTQ individuals; associate with protected classes; advocate on behalf of protected classes; and made it reasonably apparent that she had engaged in such protected conduct or would do so in the future.

302. As alleged herein, Defendants RCLS Board, York, Duffield, Wiencek, Huddleston, Quesenberry, Thomas, Piazza, and Curtis had final policymaking authority from Defendant RCLS when they discriminated against, retaliated against, and engaged in anticipatory retaliation against Ms. James because of her opposition to sex-based discriminatory practices, her association with and advocacy on behalf of such protected classes, and the expectation that she would continue engaging in such protected activities in the future.

303. As alleged herein, Defendants were an affirmative link and a causal connection to the discrimination, retaliation, and anticipatory retaliation carried out by the above-listed final policymakers.

304. Defendants had control of employment and operational decisions within RCLS and intentionally exercised that control to discriminate and retaliate against Ms. James.

305. At all times relevant to this claim, it was clearly established that supervisors and library board members could not deny an employee's right to equal

protection under the laws of the United States by discriminating and retaliating against employees on the basis of their sex-based opposition, advocacy, and association. Any reasonable supervisor or library board member acting under color of state law knew or should have known of these clearly established rights.

306. Among other acts of discrimination and retaliation alleged herein, Defendants York, Duffield, Wiencek, Huddleston, Quesenberry, Thomas, Piazza, and Curtis were antagonistic towards Ms. James and her protected activities, encouraged others to be so as well, and ultimately terminated Ms. James' employment.

307. Defendants' discriminatory animus towards LGBTQ community members and Ms. James' protected activities were the but-for cause of Defendants' discrimination and retaliation.

308. Defendants' actions, as alleged herein, were undertaken with malice or reckless disregard for Ms. James' federally protected rights.

309. As a result of Defendants' conduct, Ms. James suffered actual economic damages and suffered other injuries, damages, and losses, including severe emotional distress and pain and suffering in an amount to be proved at trial.

**SEVENTH CLAIM FOR RELIEF**
42 U.S.C. § 1985(3)
Conspiracy under the Ku Klux Klan Act
(Against Defendants York, Duffield, Wiencek, Huddleston, Quesenberry, Thomas, Piazza, and Curtis)

310. Ms. James hereby incorporates all other paragraphs of this Complaint as if fully set forth herein.

311. Although not necessary for a Section 1985 claim, at all times relevant to this claim, Defendants York, Duffield, Wiencek, Huddleston, Quesenberry, Thomas, Piazza, and Curtis were acting under color of state law.

312. Defendants York, Duffield, Wiencek, Huddleston, Quesenberry, Thomas, Piazza, and Curtis conspired with each other and with pro-censorship, anti-LGBTQ rights activists to fire Ms. James for her advocacy on behalf of members of the LGBTQ community, and for her refusal to carry out Defendants' censorship demands that discriminate against specific minority populations.

313. Section 1985(3) prohibits when "two or more persons in any State or Territory conspire . . . for the purpose of depriving, either directly or indirectly, any person or class of persons of the equal protection of the laws, or of equal privileges and immunities under the laws; or for the purpose of preventing or hindering the constituted authorities of any State or Territory from giving or securing to all persons within such State or Territory the equal protection of the laws[.]"

314. Ms. James brings this claim under both the "deprivation" clause and the "hindrance clause" of Section 1985(3) in that Defendants conspired both to deprive a person or class of persons equal privileges and protection of the law as described above and conspired for the purpose of preventing or hindering Ms. James from securing the same to all persons within the state.

315. At all times relevant to this claim, Ms. James enjoyed those rights previously alleged, including the rights to equal protection under the laws of the United States and the rights to oppose discriminatory practices, to advocate and

associate with LGBTQ community members, and to engage in protected speech pursuant to the First Amendment.

316. As alleged herein, Defendants plotted, coordinated, and executed a common plan with each other to engage in discrimination, retaliation, obstruction, intimidation, and threats against LGBTQ community members, and Ms. James for associating and advocating for them, in violation of Ms. James' rights and those of others in their community.

317. As alleged herein, in furtherance of their conspiracy to deprive Ms. James and others of equal protection or equal privileges and immunities under the Fourteenth Amendment, Defendants acted on class-based animus and engaged in acts of intimidation, threats, discrimination, and retaliation.

318. As alleged herein, together, Defendants conspired to prevent and hinder Ms. James, from giving or securing constitutional rights and equal protection of the law to all RCLS patrons.

319. The illegal activities described above were undertaken by Defendants as overt acts pursuant to an unlawful conspiracy, the purpose of which was to both hinder Ms. James in giving or securing to all persons equal protection of the laws, and to oppress, harass, and stigmatize LGBTQ community members in violation of the Fourteenth Amendment, and through them Ms. James, in violation of the rights guaranteed by the Constitution and laws of the United States.

320. The conspiracy was motivated by a class-based invidious discriminatory animus.

321. The conspiracy was aimed at interfering with rights that by definition are protected against private, as well as official, encroachment.

322. The illegal activities described above were undertaken by Defendants in furtherance of their personal animus towards LGBTQ community members.

323. At all times relevant to this claim, it was clearly established that library board members and supervisors could not engage in conspiracies to deprive public employees of these rights. Any reasonable library board member or supervisor acting under color of state law knew or should have known that such conspiracies were clearly unlawful.

324. As a result of Defendants' conduct, Ms. James suffered actual economic damages and suffered other injuries, damages, and losses, including severe emotional distress and pain and suffering in an amount to be proved at trial.

**EIGHTH CLAIM FOR RELIEF**
42 U.S.C. § 1983
Violations of the First Amendment's Establishment Clause,
Government Endorsement and/or Favoring of One Religion
Over Other Religions or Non-Religion
(Against All Defendants)

325. Ms. James hereby incorporates all other paragraphs of this Complaint as if fully set forth herein.

326. At all times relevant to this claim, Defendants were acting under color of state law.

327. The Establishment Clause prohibits the government from taking actions that endorse, advance, or impose religious doctrine, or showing preference for any particular religion or religious beliefs in general.

328. Specifically, the Establishment Clause prohibits any practice that "make[s] a religious observance compulsory." *Kennedy v. Bremerton Sch. Dist.*, 597 U.S. 507, 537 (2022) (quotations omitted). An example is when a school broadcasts prayers over a public address system at a football game. *Id*. at 542. This impermissible coercion is especially present when a government entity imposes discipline on those who do not participate in the religious practices being imposed by the government. *Cf. id*. (discussing how coercion was less likely when students were not punished for forgoing an invitation to pray).

329. Government-provided benefits, including access to public library resources, cannot be conditioned on someone sharing, or participating in, the government's preferred religion. *Id*.

330. RCLS and its collections constitute a public benefit, and any decisions about the scope and accessibility of that collection must comply with the Establishment Clause.

331. Defendants acted to shape RCLS's collection in a way that endorsed, advanced, or favored one particular limited religious ideology, specifically a narrow and sectarian interpretation of Christianity, over other Christian denominations, other religions, and other religious beliefs, and non-religious perspectives.

332. As alleged herein, Defendants sought to compel Ms. James to censor or exclude content, including LGBTQ content, based on the belief that such material was inconsistent with their preferred religious doctrine.

333. When Ms. James refused to adopt or enforce viewpoint-based censorship policies grounded in Defendants' religious ideology, Defendants revised

the Reconsideration Policy and terminated Ms. James in order to impose their religiously motivated agenda in RCLS.

334. These actions were taken to ensure that public library collection and access decisions aligned with and promoted Defendants' preferred religious beliefs, to the exclusion of others, in violation of the First Amendment.

335. At all times relevant to this claim, Ms. James had a constitutional right to oppose government actions that improperly endorsed, advanced, or imposed religious doctrine in a public institution.

336. Defendants RCLS Board, York, Duffield, Wiencek, Huddleston, Quesenberry, Thomas, Piazza, and Curtis, as final policymakers for Defendant RCLS, exercised control over RCLS operations in furtherance of an unconstitutional goal: to shape public resources in line with a particular religious belief.

337. Defendants used their control over hiring, policy, and personnel to advance and institutionalize religious preferences within RCLS.

338. At all times relevant to this claim, it was clearly established that the government may not favor one religion, religious sect, or religious viewpoint over others, or over non-religion, when administering public services, including public libraries.

339. Defendants terminated Ms. James' employment in order to remove an impediment to their efforts to implement religiously motivated censorship in RCLS.

340. Defendants' actions, including revisions of library policies and Ms. James' termination violated the Establishment Clause of the First Amendment.

341. Defendants' actions, as alleged herein, were undertaken with malice or reckless disregard for Ms. James' federally protected rights.

342. The value of Ms. James' rights under the Establishment Clause outweighed any legitimate governmental interest. Indeed, Defendants' violation of the Establishment Clause was intentional, in reckless or callous disregard for Ms. James' federally protected rights, and not in furtherance of any legitimate governmental interest. *See Epperson v. State of Ark.*, 393 U.S. 97, 107 (1968) (quoting *Joseph Burstyn, Inc. v. Wilson*, 343 U.S. 495, 505 (1952)) ("[T]he state has no legitimate interest in protecting any or all religions from views distasteful to them").

343. As alleged herein, Defendants' actions were based on the religious views of some, which they elevated above other beliefs and identities through official action.

344. As a result of Defendants' violations of the Establishment Clause, Ms. James suffered actual economic damages and suffered other injuries, damages, and losses, including severe emotional distress and pain and suffering in an amount to be proved at trial.

**NINTH AND TENTH CLAIMS FOR RELIEF**
42 U.S.C. § 1983
Discrimination and Retaliation against Protected Speech and Association in Violation of the First Amendment
(Against All Defendants)

345. Ms. James hereby incorporates all other paragraphs of this Complaint as if fully set forth herein.

346. At all times relevant to this claim, Defendants were acting under color of state law.

347. At all times relevant to this claim, Ms. James enjoyed the First Amendment rights to engage in speech on matters of public concern; be free from state action that deters and chills protected speech; and to associate freely.

348. At all times relevant to this claim, Ms. James was entitled to oppose unconstitutional censorship and discrimination without reprisal.

349. As alleged herein, Ms. James opposed, spoke out against, and refused to comply with unlawful and unconstitutional censorship, both in private and publicly.

350. Ms. James was not responsible for making determinations about freedom of speech and the unlawfulness of Defendants' removal, segregation of, and censorship of categories of books, nor was she responsible for policymaking decisions regarding RCLS's collection including the removal and censorship of categories of books.

351. As a public employee, Ms. James' job duties did not (nor could they) include systematic suppression of the First Amendment rights of RCLS patrons by censoring books based on disfavored content or their association with historically marginalized minority groups, nor did they include engaging in systematic discrimination against a discrete group of library users.

352. Ms. James' raising concerns and criticism of Defendants and their restrictions on speech and association were outside the scope of her job duties.

353. Ms. James' critiques of RCLS policies were outside the scope of her job duties.

354. Ms. James' speech on those subjects did not contribute to or facilitate her performance of duties for RCLS.

355. The suppression of speech and association in public libraries is also a matter of public concern.

356. As alleged herein, Defendants RCLS Board, York, Duffield, Wiencek, Huddleston, Quesenberry, Thomas, Piazza, and Curtis had final policymaking authority from Defendant RCLS when they retaliated and discriminated against Ms. James with the intent to chill and deter her protected speech and association.

357. As alleged herein, Defendants were an affirmative link and a causal connection to the discrimination and retaliation carried out by the above-listed final policymakers.

358. Defendants had control of employment and operational decisions within RCLS and exercised that control to discriminate and retaliate against Ms. James.

359. Specifically, Defendants engaged in viewpoint discrimination and retaliation, that is, they engaged in censorship based on their disagreement with the content of Ms. James' protected speech and association. Viewpoint discrimination is presumptively unconstitutional and subject to strict scrutiny.

360. At all times relevant to this claim, it was clearly established that supervisors and library board members could not discriminate and retaliate against public employees who engage in protected speech and association because of disagreements with their viewpoints. Any reasonable supervisor or library board member acting under color of state law knew or should have known of these clearly established rights.

361. Among other acts of discrimination and retaliation alleged herein, Defendants York, Duffield, Wiencek, Huddleston, Quesenberry, Thomas, Piazza, and Curtis were antagonistic towards Ms. James and her protected activities, encouraged others to be so as well, and ultimately terminated Ms. James' employment.

362. Defendants' actions, as alleged herein, were undertaken with malice or reckless disregard for Ms. James' federally protected rights.

363. The value of Ms. James' speech outweighed any legitimate governmental interest. Indeed, Defendants' discrimination and retaliation against Ms. James was intentional, vexatious, willful and wanton, in total disregard for her rights, and not in furtherance of any legitimate governmental interest. Defendants' non-discriminatory and non-retaliatory reasons for their conduct are pretextual.

364. As a result of Defendants' discrimination and retaliation, Ms. James suffered actual economic damages and suffered other injuries, damages, and losses, including severe emotional distress and pain and suffering in an amount to be proved at trial.

## PRAYER FOR RELIEF

**WHEREFORE**, Ms. James respectfully requests that this Court enter judgment in her favor and against Defendants, and award her all relief as allowed by law, including but not limited to the following:

a) All declaratory relief and injunctive relief, as appropriate;

b) Actual economic damages, including but not limited to back pay, front pay, and lost benefits, as established at trial;

c) Compensatory damages, including but not limited to those for future pecuniary and non-pecuniary losses, emotional pain, suffering, inconvenience, mental anguish, and other non-pecuniary losses;

d) Punitive damages for all claims as allowed by law, to the maximum amount permitted and in an amount to be determined at trial;

e) Prejudgment and post-judgment interest at the highest lawful rate;

f) A tax-offset;

g) Attorney fees and costs; and

h) Such further relief as justice requires, including further injunctive relief against all Defendants to cease and desist from discrimination, retaliation, and censorship.

Date: September 23, 2026

Respectfully submitted,

*/s/___Richard Charles Mangelsdorf*
Chuck Mangelsdorf Thompson
Mangelsdorf 3200 West End
Ave, Suite 500 Nashville, TN
37203
(615) 320-4344 (office)(615)
351-1019 (direct)
chuckmangelsdorf@gmail.com

/*s/ Iris Halpern*
Iris Halpern*
Colo. State Bar No. 53112
Azra Taslimi*
Colo. State Bar No. 44317
Stephanie Wise*
Colo. State Bar No. 60626
Neil Sandhu*
Colo. State Bar No. 56600
RATHOD | MOHAMEDBHAI LLC
2701 Lawrence Street, Denver, CO 80205

Telephone: (303) 578-4400
Facsimile: (303) 578-4401
ih@rmlawyers.com
at@rmlawyers.com
sw@rmlawyers.com
ns@rmlawyers.com

** Pro Hac Vice Pending*

*Attorneys for Plaintiff*